## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**STEVEN A. SMITH**                                      **CIVIL ACTION**

**VERSUS**                                               **CASE NO. 13-5505**

**BOARD OF SUPERVISORS FOR THE**                         **SECTION: "G" (3)**
**UNIVERSITY OF LOUISIANA SYSTEM,** *et al.*

### ORDER

In this litigation, Plaintiff Steven A. Smith ("Smith"), a former tenured Associate Professor at the University of New Orleans, alleges that Defendant Board of Supervisors for the University of Louisiana System ("Board of Supervisors") denied him due process and breached its contract with him when it terminated him from his position at the University of New Orleans ("UNO").[1] Pending before the Court is Board of Supervisors' "Motion for Summary Judgment."[2] Having considered the motion, the memorandum in support, the memorandum in opposition, the record, and the applicable law, the Court will deny the motion.

### I. Background

#### A.    *Factual Background*

Smith alleges that he was hired by UNO in January 1999 as an Assistant Professor in the Department of Management, College of Business, where he was continuously employed, save for

---

[1] Rec. Doc. 55. Although the Third Amended Complaint brings claims against Board of Supervisors, as well as John Williams and Louis Paradise, in the Joint Status Report filed after the Third Amended Complaint, the parties indicate that the claims against John Williams and Louis Paradise have been dismissed by the Court. Rec. Doc. 56. Furthermore, in the parties' "Pre-Trial Order" submitted on December 9, 2015, the parties list only Board of Supervisors as a defendant. Rec. Doc. 70. Accordingly, it appears that Smith has abandoned any claims against John Williams and Louis Paradise.

[2] Rec. Doc. 62.

a period spent working in London on a consulting project, until May 2012.[3] Smith claims that he received an "Outstanding Teacher Award" in 2009-2010, and "ha[d] been rated the highest rating of 10 in teaching" for the last five years of his employment at UNO.[4] He alleges that he was awarded tenure and was promoted to the position of Associate Professor of Management on April 25, 2008.[5] Smith contends that in March 2009 and March 2011, he was denied sabbatical leave, despite the "strong" recommendation of his supervisor, the Chair of the Department of Management, Dr. Olie Lundberg ("Lundberg").[6]

Smith alleges that after he was denied "sabbatical" for the second time,[7] he inquired with Lundberg in April 2011 about teaching abroad during the Spring 2012 semester, and received a supportive response from Lundberg.[8] On Lundberg's advice, Smith claims, he contacted the UNO Division of International Education ("Division") and received information about teaching exchange programs to which he could apply.[9] Smith claims that he indicated to the Division that he was interested in applying to the Federal University of Bahia ("UFBA"), in Brazil, and, upon the Division's request, subsequently sent his curriculum vitae to the Division in May 2011 so that the

---

[3] Rec. Doc. 32 at p. 3.

[4] *Id.*

[5] *Id.*

[6] *Id.* at pp. 3–4.

[7] Although Smith uses the word "tenure" in his complaint, given that Smith alleges repeatedly that he was, in fact, tenured, and given that Smith states that he was twice denied *sabbatical leave*, the Court infers that Smith likely intended to use the word "sabbatical," instead of "tenure," in this context. Rec. Doc. 32 at p. 3.

[8] *Id.* at pp. 3–4.

[9] *Id.* at p. 4.

Division could contact the UFBA.[10] Smith alleges that the Division submitted his information to UFBA in May 2011, eliciting a very positive response from UFBA, which the Division relayed to Smith on June 1, 2011.[11]

Smith claims that he corresponded with a UFBA professor from June 2011 to August 2011, and met with that professor, with Lundberg assuring Smith that the Interim Dean of the College of Business, Dr. John Williams ("Williams"), was aware of the process.[12] In September 2011, Smith allegedly received confirmation from the UFBA professor that he had been approved to teach a course starting in February 2012.[13] Smith alleges that this was an unpaid position, "arranged and sanctioned by the [Division]," in which Smith would "serve[] as a representative of UNO," and work to enhance UNO's relationships with universities in Latin America.[14] Smith contends that he informed Lundberg that he had been approved to teach at UFBA, and that Lundberg was "very supportive," assuring Smith that he was "prepared for Dr. Smith to accept this assignment," and that he "had the resources to cover the courses Dr. Smith would normally teach at UNO in the Spring Semester."[15] Smith alleges that Lundberg informed him that his placement required the approval of Dean Williams, but that getting Williams's approval "should not be a problem because usually the Deans rely on the Department Chair's recommendation, based on their ability to cover the course

---

[10] *Id.*

[11] *Id.* at pp. 4–5.

[12] *Id.* at p. 5.

[13] *Id.*

[14] *Id.*

[15] *Id.* at pp. 5–6.

3

load."[16]

According to Smith, Williams decided, in November 2011, that he did not approve of Smith's assignment at UFBA, notwithstanding Lundberg's approval.[17] Williams' rejection came as a surprise to Smith, since Smith believed that "the Dean and all of the required parties at UNO had approved" the assignment and that Williams had been aware of Smith's efforts to pursue the assignment "throughout the process," with Williams' approval being the reason "why things continued to move forward."[18] In the face of this rejection, Smith claims, he faced "the dilemma of being on the schedule to teach a class in February and now having to teach his classes at UNO beginning in January," a dilemma that Smith resolved by requesting that his placement at UFBA be delayed so that Smith could teach his classes at UNO before going to Brazil.[19] Smith claims that UFBA agreed to delay his class until April 27, 2012, which left a two-week overlap between UNO's spring semester and the UFBA course.[20] Smith alleges that he informed Lundberg of the overlap, and that Lundberg found the overlap unproblematic.[21] Subsequently, Smith claims, Lundberg informed Williams of Smith's schedule at UFBA, and then told Smith that Williams approved the new schedule.[22]

---

[16] *Id.* at p. 6.

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.* at pp. 6–7.

[21] *Id.*

[22] Smith contends that "[t]his situation arose even after [he] went through the proper channels at UNO to get the teaching assignment in Brazil approved," and that "[o]nce [he] was officially on the schedule at UFBA, students in Brazil started registering for the course immediately." *Id.*

Smith contends that he taught three courses at UNO during the Spring 2012 semester, and gave his students the last two weeks to work on final group projects.[23] According to Smith, he "had always given students the last two weeks of the semester to work with their groups," and received submitted final projects through an online course management system, which was a "common practice among the faculty at UNO."[24] Smith claims that he had never been told during his entire 13-year-term at UNO that such a practice was inappropriate or unacceptable.[25] According to Smith, he planned his trip to Brazil so that he would "arrive in time for his first class on April 27, 2012," since there was "no need for Dr. Smith to be in the classroom the last two weeks of the semester."[26] All of Smith's students, he alleges, were "aware of his teaching assignment in Brazil and were prepared to complete their work and submit it as planned."[27]

Smith alleges that he arrived in Brazil on April 24, 2012, having paid for his travel and living expenses himself, and having sought the assignment "for the learning experience and for professional development," through the "process as described and presented to him" by Lundberg and the Division, with the approval and sanction of UNO.[28] He claims that on May 11, 2012, Williams "accused him of abandoning his classes," and Lundberg notified him that Williams "was threatening to terminate him" for giving his students the final two weeks of the semester to work on

---

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] *Id.* at p. 8.

final projects while he was in Brazil.[29] Smith maintains that despite being "informed on two different occasions that his teaching in Brazil was approved at every level," Williams "sent him a series of threatening messages."[30] During this time, Smith alleges, he continued to grade the final reports submitted by UNO students and answer students' questions "in preparation for submitting their grades to the registrar," which grades he submitted "by the time they were due on May 15, 2012."[31]

Smith claims that between May 11, 2012 and May 14, 2012, he communicated with Lundberg "a number of times about the crisis at UNO and Dr. Williams' and the Interim Provost, Dr. Louis Paradise's, threats to terminate him."[32] According to Smith, "[t]hey also threatened to stop Dr. Smith's paycheck for the last three weeks of the semester."[33] Smith claims that Lundberg told Williams and Paradise that "their talk of terminating [him] was unwarranted and way over the top," and that Lundberg informed him that Williams instructed him "in very stern language," that he was not to speak directly to Paradise regarding Smith's situation, notwithstanding Lundberg's long-standing professional relationship with Paradise.[34] According to Smith, Lundberg told him that he believed Williams "knew that if he spoke to Paradise directly about the details," the situation "would have been resolved quickly," with Paradise handling it "without threatening Dr. Smith."[35] Smith claims that Lundberg told Williams "on more than one occasion that he was not handling the

---

[29] *Id.*

[30] *Id.*

[31] *Id.* at pp. 8–9.

[32] *Id.* at p. 9.

[33] *Id.*

[34] *Id.*

[35] *Id.*

situation well, and that he disagreed very strongly with his decisions."[36] According to Smith, Lundberg did not speak to Paradise directly because he feared that doing so after Williams told him not to might threaten his relationship with Williams, who was his direct supervisor, as well as his position as Chair.[37]

Around this time, Smith claims, Williams showed Lundberg a handwritten note from Paradise that stated "terminate him," apparently in reference to Smith.[38] This, according to Smith, "was a direct way of communicating the fact that Dr. Paradise wanted Dr. Smith fired," a decision Paradise made "without any input of the facts of the situation" from Lundberg, who was "intimately familiar with the situation."[39] Smith alleges that Williams did not speak directly with him about his termination for three days, instead communicating "through Dr. Lundberg," until Smith called Williams on May 14, 2012 "to speak to him directly."[40] When he talked to Williams, Smith claims, Williams "immediately threatened to withhold [his] pay if he did not resign immediately," and "told Smith that he would instruct the [U]niversity to go into his bank account" at the UNO Federal Credit Union "to take money out if the payment was automatically deposited before he resigned."[41]

According to Smith, he was "under extreme pressure," since he was "alone in a foreign country teaching on behalf of UNO" and "[a]ll of his living expenses in Brazil were coming out of his May 14th paycheck and the income he was scheduled to receive for teaching an online summer

---

[36] *Id.*

[37] *Id.*

[38] *Id.* at p. 10.

[39] *Id.*

[40] *Id.*

[41] *Id.*

course at UNO."[42] Smith claims that he was a "tenured faculty member being threatened with termination without due process," since Williams conditioned delivery of his May 14, 2012 paycheck upon his immediate resignation.[43] Smith alleges that, after speaking with Williams, he contacted Lundberg, who advised him to resign.[44] According to Smith, he submitted his letter of resignation on that same day, May 14, 2012.[45]

### B.     *Procedural Background*

On April 24, 2013, Smith filed an action against Defendants Board of Supervisors, John Williams, and Louis Paradise in the Civil District Court for the Parish of Orleans,[46] and Defendants removed the action to this Court on August 20, 2013.[47] Smith filed a Supplemental and Amending Complaint on August 28, 2013.[48] Defendants filed a "Rule 12(b)(6) Motion to Dismiss" on September 27, 2013.[49] On September 30, 2014, the Court granted Smith leave to amend his pleadings, denied without prejudice Defendants' motion, and ordered the parties to provide further briefing related to that motion.[50] Smith filed a Second Amended Complaint on October 14, 2014.[51]

---

[42] *Id.*

[43] *Id.*

[44] *Id.* at pp. 10–11.

[45] *Id.* at p. 11.

[46] Rec. Doc. 1 at p. 10.

[47] Rec. Doc. 1.

[48] Rec. Doc. 8.

[49] Rec. Doc. 11.

[50] Rec. Doc. 30.

[51] Rec. Doc. 32.

In his Second Amended Complaint, Smith asserted causes of action: (1) under § 1983, against Williams and Paradise, in their individual capacities, for violating his Fourteenth Amendment rights in connection with the alleged constructive discharge; (2) under § 1981, against the Board of Supervisors, Williams, and Paradise, "in their official and individual capacities," for "not providing him with equal working conditions that it provided the Caucasian faculty members and terminating his employment; (3) under Title VII, against the Board of Supervisors, for subjecting him to "a hostile working environment, discriminating against him on account of his race and constructively discharging him on account of his race;" (4) under a breach of contract theory, against the Board of Supervisors, for "terminating a tenured faculty member without cause" and for "failing to adhere to the policies and procedures explicitly outlined by the University and the University System;" (5) under an intentional infliction of emotional distress theory, against the Board of Supervisors, for "engaging in efforts to force [him] to resign."[52]

Defendants filed a "Rule 12(b)(6) Motion to Dismiss" on November 14, 2014.[53] On January 21, 2015, the Court granted the motion in part and denied it in part.[54] The Court granted the motion to dismiss as to Smith's § 1983, § 1981, Title VII, intentional infliction of emotional distress, and Louisiana employment discrimination laws.[55] The Court denied the motion to dismiss as to Smith's breach of contract claim and Louisiana due process claim, to the extent that Smith asserted those claims.[56] The Court also ordered the parties to submit summary judgment-type evidence to satisfy

---

[52] *Id.* at pp. 18–19.

[53] Rec. Doc. 40.

[54] Rec. Doc. 43.

[55] *Id.* at p. 81.

[56] *Id.*

9

the Court that it has diversity jurisdiction over the remaining claims in light of the fact that the federal claims had been dismissed.[57]

Both Defendant Board of Supervisors and Smith filed memoranda in response to the Court's Order, asserting that Plaintiff's asserted damages, consisting of compensatory damages, back pay, benefits, reinstatement or front pay, punitive damages, and attorney's fees, satisfy the amount in controversy requirement.[58] Board of Supervisors attached an affidavit of Ranzy Montet, Assistant Vice-President for Human Resource Management at the University of New Orleans, who attests that Smith's yearly salary was $88,309 and his fringe benefits, which included retirement and health insurance, totaled $97,524.13.[59] Smith attached an affidavit in which he stated that the total loss as a result of his constructive discharge is $200,190, which includes the cost of his job search, loss of summer 2012 earnings, travel and moving expenses to his next place of employment, loss of tenure, and lost earnings as a professor for the years 2012, 2013, and 2014 based on cost of living differences.[60]

On April 10, 2015, Smith filed a "Third Amended Complaint," incorporating by reference all allegations in the Second Amended Complaint and adding a claim that Defendants have violated the Louisiana due process clause.[61]

On November 12, 2015, Board of Supervisors filed a "Motion for Summary Judgment."[62]

---

[57] *Id.* at p. 82.

[58] Rec. Doc. 48 at p. 7; Rec. Doc. 49.

[59] Rec. Doc. 48-2.

[60] Rec. Doc. 49-1.

[61] Rec. Doc. 55.

[62] Rec. Doc. 67.

On December 4, 2015, Smith filed his opposition.[63]

## II. Parties' Arguments

### A. *Board of Supervisors' Arguments in Support of its Motion for Summary Judgment*

Board of Supervisors moves for summary judgment on Smith's remaining claims, namely Smith's Louisiana procedural due process and breach of contract claims.[64]

Board of Supervisors first asserts that Smith's breach of contract claim fails because Smith cannot show the existence of a contract between Smith and Defendant.[65] Board of Supervisors asserts that, under Louisiana law, four elements are necessary for the formation of a valid contract: "(1) the parties must have the capacity to contract; (2) the parties must freely give their mutual consent to the contract; (3) the parties must have a cause or reason for obligating themselves; and (4) the contract must have a lawful purpose."[66] According to Board of Supervisors, Smith has admitted in discovery that he was not provided with a specific tenure contract, but rather relied upon the UNO bylaws and the faculty handbook, which specifically provides that the "[m]aterial in this handbook is for informational purposes only and should not be construed as a formal contractual agreement between the University and its faculty."[67] In support, Board of Supervisors cites a Louisiana Fourth Circuit Court of Appeal case, *Stanton v. Tulane University of Louisiana*,[68] stating that, in that case, the court held that a professor could not maintain a claim for breach of an

---

[63] Rec. Doc. 68.

[64] Rec. Doc. 67-2 at p. 1.

[65] *Id.* at p. 7.

[66] *Id.* at p. 8 (citing *Ingraffia v. NME Hosps., Inc.*, 943 F.2d 561, 565 (5 Cir. 1991)).

[67] *Id.* (citing Rec. Doc. 67-3 at p. 9; Rec. Doc. 67-4 at p. 1).

[68] 2000-0404 (La. App. 4 Cir. 1/10/01); 777 So. 2d 1242.

employment contract without an actual employment contract, and that the employment handbook could not constitute a contract.[69]

Board of Supervisors contends that even if the Court finds the handbook to be a contract, Smith's breach of contract claim should still be dismissed because, it asserts, there is evidence that Smith did not have the necessary approval to teach abroad.[70] Board of Supervisors asserts that Dr. Alea M. Cot, Assistant Provost for International Education and the Director of the Division of International Education, testified that faculty exchange is not a right, nor is it assured by any agreements with another university.[71] Furthermore, Board of Supervisors asserts that Dean Williams did not support Smith teaching abroad because of ongoing budget problems which necessitated a policy of not granting sabbatical leave.[72] According to Board of Supervisors, Smith left for Brazil before the end of the spring semester after being told that he could not leave for the spring semester.[73] Board of Supervisors contends that Smith has admitted that the official end of the spring 2012 term was May 15, 2012.[74] According to Williams, Board of Commissioners asserts that Smith would have needed approval from the Provost in order to be away from New Orleans for the last two weeks of the semester, and there would have to be extenuating circumstances for such an absence to be permitted.[75] Furthermore, Board of Supervisors asserts that Smith did not complete his classes

---

[69] Rec. Doc. 67-2 at p. 8.

[70] *Id.* at p. 9.

[71] *Id.* at p. 10 (citing Rec. Doc. 67-5 at p. 6).

[72] *Id.* at p. 12 (citing Rec. Doc. 67-14 at pp. 10–11).

[73] *Id.* at p. 13 (citing Rec. Doc. 67-14 at p. 17).

[74] *Id.* at p. 14 (citing Rec. Doc. 67-16 at p. 14).

[75] *Id.* at p. 16 (citing Rec. Doc. 67-17 at pp. 5–6).

12

because a professor is required to be in the assigned classroom for a final exam or for the presentation of final projects, and that turning in grades, alone, while in Brazil is not sufficient.[76] Board of Supervisors also contends that Smith failed to hold office hours as required by the faculty handbook.[77]

Furthermore, Board of Supervisors contends that the summary judgment evidence shows that Smith was not terminated but voluntarily resigned.[78] Citing the Fifth Circuit in *Jackson v. Cal-Western Packaging Corp.*,[79] Board of Supervisors contends that the only evidence that Smith was terminated "is his own self-serving, uncorroborated, and conclusory statements in his testimony which are insufficient to defeat a motion for summary judgment."[80]

Board of Supervisors also moves for summary judgment on Smith's Louisiana procedural due process claim.[81] Board of Supervisors asserts that Article 1, Section 2 of the Louisiana Constitution states that "[n]o person shall be deprived of life, liberty, or property, except by due process of law" and that the Louisiana Constitution due process clause "does not vary semantically from the due process clause of the Fourteenth Amendment."[82] Board of Supervisors asserts, therefore, that Smith's state law claim for violation of due process must be analyzed under the

---

[76] *Id.* (citing Rec. Doc. 67-17 at pp. 17–18).

[77] *Id.* (citing Rec. Doc. 67-17 at pp. 30–31; Rec. Doc. 67-4).

[78] *Id.* at p. 20.

[79] 602 F.3d 374, 379 (5th Cir. 2010).

[80] Rec. Doc. 67-2 at p. 20.

[81] *Id.* at p. 25.

[82] *Id.* at p. 26 (citing *Plaquemines Par. Gov't v. River/Rd. Const.*, Inc., 2001-2222 (La. App. 4 Cir. 8/28/02); 828 So. 2d 16, 24).

standard set in the Fourteenth Amendment.[83] Board of Supervisors contends that the Court, in granting its motion to dismiss on the federal due process claim, found that Smith's pre-termination communication was sufficient as a matter of law to meet procedural due process requirements as long as a full post-termination hearing was also available to Smith at a meaningful time.[84] According to Board of Supervisors, the Court rejected Smith's assertion that he was unable to file a grievance because he was out of the country as he had maintained regular contact with UNO while in Brazil and therefore, having failed to timely avail himself of a hearing under UNO policies, could not claim that Defendants were responsible for depriving him of post-deprivation hearing.[85] Board of Supervisors contends that the summary judgment evidence confirms that Louisiana's due process requirements have been met.[86]

**B.    *Smith's Arguments in Opposition***

In opposition to Board of Supervisors' motion for summary judgment on Smith's breach of contract claim, Smith asserts that it is "well-known in the academic profession that tenured faculty have property rights in their positions, that they cannot be terminated without cause and that they cannot be terminated without due process."[87] According to Smith, "[t]hose rights are contractual rights acquired when the faculty member obtains tenure."[88] In support, Smith quotes the dictionary definition of tenure as "[s]tatus afforded to teacher or professor upon completion of trial period, thus

---

[83] *Id.* at p. 27.

[84] *Id.* at p. 28 (citing Rec. Doc. 43 at p. 42).

[85] *Id.* (citing Rec. Doc. 43 at p. 45).

[86] *Id.*

[87] Rec. Doc. 68 at p. 9.

[88] *Id.*

14

protecting him or her from summary dismissal without sufficient cause or economic reasons . . . .

Tenure denotes relinquishment of the employer's unfettered power to terminate the employee's

services."[89] Smith also quotes a journal article, stating that "[t]enure is a radical departure from the

ordinary 'at will' employment law of the USA . . . Tenure is a contract right that can rise to the level

of constitutionally protected personal property."[90] Smith contends that Paradise confirmed in his

deposition that this definition applied at the University of New Orleans when Smith was granted

tenure.[91] Smith asserts that in Paradise's deposition, he testified that upon achieving tenure, Smith

was no longer an at-will employee, no longer on a yearly contract, and that there were procedures

in the faculty handbook that apply to tenured faculty members.[92] According to Smith, this shows that

he "clearly had a property right or a contractual right to continued employment with the expectation

that he could not be terminated without cause and without due process" and that "[b]ecause UNO

disputes the existence of contractual rights, there is a genuine issue of fact that is not properly

resolved by summary judgment."[93]

Furthermore, Smith refers to Board of Supervisors' assertions that "[a] teacher would

certainly have to have permission to leave the University before the end of the semester because

failure to do so would violate the term of his contract."[94] Smith asserts that Dr. James W. Logan

---

[89] *Id.* (citing *Black's Law Dictionary* (6th ed. 1990)).

[90] *Id.* (quoting Graham Mitenko & Michael O'Hara, *Assessing the Mobility Value of Tenure to the Faculty Member*, 1 *Econ. & Bus. J.: Inquiries & Persp.* 1, 2 (2008)).

[91] *Id.*

[92] *Id.* at p. 10 (citing Rec. Doc. 68-5 at p. 2).

[93] *Id.* at p. 11.

[94] *Id.* at p. 16 (citing Rec. Doc. 67-2 at p. 20).

("Logan"), former Dean of the College of Business, and Board of Supervisors have acknowledged that there was a contract between the faculty and the University, even though there was not a physical document signed by both parties.[95]

Smith asserts that *Stanton v. Tulane University of Louisiana*, the Fourth Circuit Court of Appeal case cited by Board of Supervisors, is not applicable here because Stanton was hired as a probationary assistant professor and therefore was on the tenure track but did not have tenure.[96] Smith argues that he had tenure, which he asserts is a contract which could only be terminated for cause and after he received due process.[97] Furthermore, Smith asserts that in *Wallace v. Shreve Memorial Library*, a Fifth Circuit case cited by Board of Supervisors, the court held that an employment manual does not meet the requirements of a contract under Louisiana law.[98] However, Smith contends that there is a fact issue as to whether he had a tenure contract and therefore summary judgment is inappropriate.[99]

In response to Board of Supervisors' argument that Smith had no tenure contract because the faculty handbook disclaims a contract of employment, Smith contends that the language in the handbook does not preclude the formation of a contract.[100] According to Smith, consistent with the language in the handbook, a contract could be a grant of tenure in conjunction with the handbook provisions that a tenured faculty member can only be terminated for cause, financial exigency, or

---

[95] *Id.*

[96] *Id.* at p. 18 (citing *Stanton v. Tulane Univ. of La.*, 2000-0403 (La. App. 4 Cir. 1/10/01); 777 So. 2d 1242).

[97] *Id.*

[98] *Id.* at p. 19 (citing *Wallace v. Shreve Mem'l Library*, 79 F.3d 427, 430–31 (5th Cir. 1996)).

[99] *Id.* at pp. 19–20 (citing *Wallace v. Shreve Mem'l Library*, 97 F.3d 746 (5th Cir. 1996)).

[100] *Id.* at p. 20.

program discontinuance, and that tenured faculty shall not be terminated without due process.[101] Smith asserts that in *Schalow v. Loyola University of New Orleans*, a Louisiana Fourth Circuit Court of Appeal case, the court incorporated by reference faculty handbook provisions into a professor's employment contract.[102]

Smith also cites the United States Supreme Court case *Perry v. Sindermann*.[103] In that case, Smith asserts that the Supreme Court had held that a professor's lack of a contractual or tenure right to reemployment, taken alone, did not defeat his claim that nonrenewal of his contract violated his free speech rights and that he was entitled to procedural due process if the college had a de facto tenure program and the professor had tenure under that program.[104] Smith contends that Board of Supervisors, in its brief, has conceded that Smith was a tenured professor.[105] Smith asserts that the agreement that Smith was tenured, along with the rights of a tenured professor to procedural due process contained in the faculty handbook, forms a tenure contract.[106]

Smith also contends that there is a genuine issue of fact regarding whether there was a breach of contract.[107] Smith asserts that there was a breach of contract because Board of Supervisors did not have just cause to terminate Smith's employment and therefore it violated Smith's tenure rights.[108]

---

[101] *Id.*

[102] *Id.* at p. 21 (citing *Schalow v. Loyola Univ. of New Orleans*, No. 94-CA-0797 (La. App. 4 Cir. 1/30/94); 646 So. 2d 502).

[103] *Id.* (citing *Perry v. Sindermann*, 408 U.S. 593 (1972)).

[104] *Id.* (citing *Perry*, 408 U.S. 593).

[105] *Id.* at p. 22.

[106] *Id.*

[107] *Id.* at p. 11.

[108] *Id.*

In response to Board of Supervisors' claim that extenuating circumstances would have to be present for a professor to be absent from the university for the last two weeks of class, Smith points to the deposition testimony of Lundberg, where Lundberg described the situation of a full-time faculty member in the Department of Management who was not required to meet with his classes in the last two weeks of the semester,[109] as well as another faculty member in the Department of Management who did not physically meet with her classes on campus during the last two weeks of the semester.[110] Furthermore, according to Smith, Lundberg's testimony demonstrates that Lundberg did not require faculty members in the Department of Management to be physically present during the last weeks of the semester.[111] Therefore, Smith asserts, there is a genuine issue of material fact as to whether Smith not being on campus during the last two weeks of the semester was cause to terminate him.[112]

Smith also asserts that there is a genuine issue of material fact as to whether he completed his Spring 2012 classes.[113] Smith contends that although Williams testified that Smith did not complete teaching those classes, Lundberg testified that Smith had completed teaching his classes.[114] Smith asserts that he continued teaching his courses while in Brazil and graded all of the final projects.[115] Smith also asserts that the evidence contradicts Williams' assertion that faculty members

---

[109] *Id.* at p. 12 (citing Rec. Doc. 68-4 at pp. 16–18).

[110] *Id.* at p. 13 (citing Rec. Doc. 68-4 at p. 11).

[111] *Id.* (citing Rec. Doc. 68-4 at p. 12).

[112] *Id.* at p. 14.

[113] *Id.*

[114] *Id.* (citing Rec. Doc. 68-3 at pp. 4–5; Rec. Doc. 68-4 at p. 11).

[115] *Id.* at p. 15.

must be on campus for six hours a week for office hours.[116]

In response to Board of Supervisors' assertion that "Dr. Williams noted that he never allowed faculty members to take the last two weeks of the semester off and have students work on their final group projects," Smith contends that this assertion is not true and that it is based upon a hearsay statement that is not an affidavit or a declaration.[117] Smith moves to strike UNO's Exhibit 16, which is an unsigned and undated document titled "My statements in response to the charges made," purportedly written by Williams, from the record.[118]

In response to Board of Supervisors' assertion that it has not been proven that the professors who were allowed to teach online while they were out of state were associate professors rather than instructors and/or adjunct instructors, who don't have the same responsibilities as associate professors, Smith contends that one such professor, Myles Hassell, as a full-time faculty member, had to abide by the same rules as associate professors.[119] Furthermore, Smith asserts that full-time instructors and adjuncts are indistinguishable from associate professors in the classroom and in their relationships and interactions with students.[120]

Smith also contends that there is a genuine issue of material fact regarding whether he was terminated or whether he voluntarily resigned.[121] In opposition to Board of Supervisors' contention

---

[116] *Id.* at p. 14.

[117] *Id.* at p. 15 (quoting Rec. Doc. 62-4 at p. 17).

[118] *Id.* (citing Rec. Doc. 67-18).

[119] *Id.* at p. 16.

[120] *Id.*

[121] *Id.* at p. 23.

that Smith voluntarily resigned, Smith points to the deposition testimony of Lundberg.[122] According to Smith, Lundberg testified that the word "terminate" was first used in reference to Smith in Lundberg's meeting with Williams.[123] Smith also contends that he saw a memo from Provost Paradise to Williams with "terminate him" written on it.[124] Smith asserts that Lundberg, who was his supervisor and the Chair of the Department of Management, recommended that Smith resign his position.[125] Smith contends that "[a]ny reasonable person in that situation would feel forced to resign, especially with the potential impact on their career and reputation."[126] Furthermore, Smith asserts that the email from Paradise which states "Talk to olie and then direct olie to dock his pay two weeks and terminate him" also demonstrates that it was clear to Smith that he would be terminated.[127] Finally, Smith avers that when he spoke with Williams, Williams threatened him immediately with termination.[128]

As for his Louisiana due process claim, Smith contends that he was denied due process through the taking away of his summer employment without due process of law in that there was no notice to Smith and no pre- or post-action hearing.[129] Smith also avers that he was constructively discharged without proper notice and without a pre-termination hearing and was also denied the

---

[122] *Id.* at p. 16.

[123] *Id.*

[124] *Id.* at p. 17.

[125] *Id.*

[126] *Id.*

[127] *Id.* at p. 18 (citing Rec. Doc. 68-13).

[128] *Id.* (citing Rec. Doc. 68-2 at p. 7).

[129] *Id.* at p. 23.

faculty post-termination grievance procedure.[130] Smith contends that although he was allegedly denied a grievance procedure because he was too late, the faculty handbook does not contain a time limit to submit a grievance.[131] Instead, Smith avers, the handbook states that a grievance must be filed "within 30 calendar days during the academic term after official notification to the faculty member of an action which the faculty member is challenging."[132] Smith contends that there was no thirty-day limit because he called about his grievance after commencement and not during an academic term, and that he has never been given an official notification of any action taken by Board of Supervisors and therefore could not have been late.[133]

Smith asserts that "fact issues exist as to whether Smith had acquired a property interest in having his employment continued; whether Smith was afforded procedural due process; and whether Smith was constructively discharged when he was given the ultimatum of being terminated or having his pay withheld or resigning."[134]

### III. Law and Analysis

A.    *Subject Matter Jurisdiction*

On January 21, 2015, the Court dismissed Smith's federal claims.[135] The Court, noting that Defendants had asserted both federal question jurisdiction and diversity jurisdiction in their notice of removal, but finding that the pleadings were deficient regarding whether diversity jurisdiction

---

[130] *Id.* at pp. 23–24.

[131] *Id.* at pp. 24–25.

[132] *Id.*

[133] *Id.* at p. 25.

[134] *Id.* at p. 23.

[135] Rec. Doc. 43.

existed, ordered the parties to submit summary judgment-type evidence regarding the amount in controversy at the time of removal.[136] When, as here, the plaintiff has alleged an indeterminate amount of damages, the Fifth Circuit requires the removing defendant to prove by a preponderance of the evidence that the amount in controversy exceeds \$75,000.[137] Both Board of Supervisors and Smith filed memoranda in response to the Court's Order asserting that Plaintiff's asserted damages, consisting of compensatory damages, back pay, benefits, reinstatement or front pay, punitive damages, and attorney's fees, satisfy the amount in controversy requirement.[138] Board of Supervisors attached an affidavit of Ranzy Montet, Assistant Vice-President for Human Resource Management at the University of New Orleans, who attests that Smith's yearly salary was \$88,309 and his fringe benefits, which included retirement and health insurance, totaled \$97,524.13.[139] Smith attached an affidavit in which he stated that the total loss as a result of his constructive discharge is \$200,190, which includes the cost of his job search, loss of summer 2012 teaching earnings, travel and moving expenses to his next place of employment, loss of tenure, and lost earnings as a professor for the years 2012, 2013, and 2014 based on cost of living differences.[140] The Court finds that it has been shown, by a preponderance of the evidence, that the amount in controversy at the time of removal exceeded \$75,000. Accordingly, the Court has diversity jurisdiction over this case.

---

[136] *Id.* at p. 82.

[137] *Gebbia v. Wal-Mart Stores, Inc.*, 233 F.3d 880, 882 (5th Cir. 2000); *see also Simon*, 193 F.3d at 850; *Allen*, 63 F.3d at 1335.

[138] Rec. Doc. 48 at p. 7; Rec. Doc. 49.

[139] Rec. Doc. 48-2.

[140] Rec. Doc. 49-1.

### B.    *Legal Standard on a Motion for Summary Judgment*

Summary judgment is appropriate when the pleadings, the discovery, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[141] When assessing whether a dispute as to any material fact exists, the court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[142] All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[143] If the record, as a whole, "could not lead a rational trier of fact to find for the non-moving party," then no genuine issue of fact exists and the moving party is entitled to judgment as a matter of law.[144] The nonmoving party may not rest upon the pleadings, but must identify specific facts in the record and articulate the precise manner in which that evidence establishes a genuine issue for trial.[145]

The party seeking summary judgment always bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.[146] Thus, the nonmoving party should "identify specific evidence in the record, and articulate" precisely how that evidence supports his claims.[147] To withstand a motion for summary judgment, a plaintiff must show that there is a genuine

---

[141] Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[142] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008).

[143] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

[144] *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).

[145] *See, e.g.*, *Celotex*, 477 U.S. at 325; *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

[146] *Celotex*, 477 U.S. at 323.

[147] *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994), cert. denied, 513 U.S. 871 (1994).

issue for trial by presenting evidence of specific facts.[148] The nonmovant's burden of demonstrating

a genuine issue of material fact is not satisfied merely by creating "some metaphysical doubt as to

the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a

scintilla of evidence."[149] Rather, a factual dispute precludes a grant of summary judgment only if the

evidence is sufficient to permit a reasonable trier of fact to find for the nonmoving party. Hearsay

evidence and unsworn documents that cannot be presented in a form that would be admissible in

evidence at trial do not qualify as competent opposing evidence.[150]

## C.   *Breach of Contract Claim*

### 1.   **Existence of a Contract**

Board of Supervisors moves for summary judgment on Smith's breach of contract claim on

the grounds that Smith cannot show the existence of a contract between him and Board of

Supervisors.[151] In opposition, Smith asserts that it is "well-known in the academic profession that

tenured faculty have property rights in their positions, that they cannot be terminated without cause

and that they cannot be terminated without due process."[152] According to Smith, "[t]hose rights are

contractual rights acquired when the faculty member obtains tenure."[153]

Louisiana Civil Code article 1906 states that "[a] contract is an agreement by two or more

parties whereby obligations are created, modified, or extinguished." Under Louisiana law, four

---

[148] *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012) (citing *Anderson v. Liberty*, 477 U.S. 242, 248–49 (1996)).

[149] *Little*, 37 F.3d at 1075.

[150] *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987); Fed. R .Civ. P. 56(C)(2).

[151] Rec. Doc. 62-4 at p. 7.

[152] Rec. Doc. 68 at p. 9.

[153] *Id.*

elements are necessary to form a valid contract: "(1) the parties must have the capacity to contract; (2) the parties must freely give their mutual consent to the contract; (3) the parties must have a cause or reason for obligating themselves; and (4) the contract must have a lawful purpose."[154] Smith alleges that "[b]y terminating a tenured faculty member without cause and failing to adhere to the policies and procedures explicitly outlined by the University and the University System, the University of Louisiana System d/b/a the University of New Orleans has breached its contractual obligations to Plaintiff."[155] It is undisputed both that Smith had tenure at the University of New Orleans and that he was not provided with a written tenure contract upon being granted tenure.[156] Rather, Smith argues, the very nature of being granted tenure gave him "a property right or a contractual right to continued employment with the expectation that he could not be terminated without cause and without due process."[157]

Board of Supervisors' motion for summary judgment is based upon their argument that the faculty handbook does not constitute a contract that can form the basis Smith's breach of contract claims.[158] In support, Board of Supervisors quotes the faculty handbook, which states that the "[m]aterial in this handbook is for informational purposes only and should not be construed as a formal contractual agreement between the University and its faculty."[159] In *Wallace v. Shreve Memorial Library*, the Fifth Circuit addressed a claim that an employment manual, which provided

---

[154] *Ingraffia v. NME Hosps., Inc.*, 943 F.2d 561 (5th Cir. 1991).

[155] Rec. Doc. 32; Rec. Doc. 55.

[156] Rec. Doc. 68-11; Rec. Doc. 67-3 at p. 9.

[157] Rec. Doc. 68 at p. 11.

[158] Rec. Doc. 62-4 at p. 9.

[159] Rec. Doc. 67-4 at p. 1.

that an employee may only be terminated for cause, constituted a contract under Louisiana law.[160]

The court surveyed Louisiana appellate decisions and concluded that while Louisiana appellate

courts "have not expressed a *per se* rule against employment manuals being contracts," they are

nonetheless "quite reluctant to find that employment manuals create contractual rights."[161] The court

noted, however, that if there were a disclaimer saying that the employment manual was not a

contract, "our job of course would be easier."[162] In this case, there is a disclaimer that the handbook

should not be construed as a formal contractual agreement. Accordingly, the Court finds that any

violations of the policies and procedures outlined in the faculty handbook cannot serve as the basis

for Smith's breach of contract claim.[163]

However, Smith also alleges that Board of Supervisors committed a breach of contract by

terminating him without cause.[164] Therefore, the Court next turns to Smith's contention that the fact

that he has been granted tenure in itself gave him a contractual right to continued employment.

Board of Supervisors does not specifically address this argument.

Smith asserts that tenure has been defined in the Sixth Edition of the Black's Law Dictionary

as "[s]tatus afforded to [a] teacher or professor upon completion of trial period, thus protecting him

or her from summary dismissal without sufficient cause or economic reasons."[165] Smith further

contends that Paradise confirmed that this definition of tenure applied to professors with tenure at

---

[160] 79 F.3d 427, 431 (5th Cir. 1996).

[161] *Id.*

[162] *Id.*

[163] *See Oller v. Rousell*, 2014 WL 1789655, at *1 (W.D. La. May 5, 2014).

[164] Rec. Doc. 32 at p. 19.

[165] Rec. Doc. 68 at p. 9 (citing *Black's Law Dictionary* (6th ed. 1990)).

the University of New Orleans.[166] When Paradise was asked what job security Smith received when he obtained tenure in 2008, Paradise responded that Smith would receive "a whole set of procedures that apply to you for negative actions . . . [Y]ou are not an at-will employee anymore . . . And the rules for dismissal are very different . . . ."[167] When Lundberg was asked to describe the benefits of tenure to an associate professor, he stated that "[t]here's some kind of de facto job security," and that "if you wanted to terminate[] them for any reason, it's more of a procedural thing you have to go through."[168] Although there was no specific written tenure contract, the parties appear to agree that Smith's achieving tenure meant that he was no longer an at-will employee.

The Supreme Court of Louisiana has explained that "[t]he historical purpose of tenure, which originated in higher education, was the protection of academic freedom by preventing arbitrary or repressive dismissal."[169] The Louisiana Fourth Circuit Court of Appeal, in distinguishing tenured and non-tenured employees, found "implicit in the status of non-tenured/probationary employee is the assumption that protection against arbitrary or repressive dismissal is absent, i.e., the doctrine of employment at will prevails."[170] In *Swetman v. Gerace*, the Louisiana First Circuit Court of Appeal held that a grant of tenure constituted a contract, despite the absence of a written tenure agreement.[171] In *Swetman*, professors with tenure argued that they were eligible for unemployment compensation benefits in between academic terms because they had no written contract of

---

[166] *Id.*

[167] Rec. Doc. 68-5 at p. 2.

[168] Rec. Doc. 68-4 at pp. 2–3.

[169] *Thorne v. Monroe City. Sch. Bd.*, 542 So. 2d 490 (La. 1989).

[170] *Schalow v. Loyola Univ. of New Orleans*, No. 94-CA-0797 (La. App. 4 Cir. 11/30/94); 646 So. 2d 502.

[171] 349 So. 2d 977, 979 (La. App. 1 Cir. 7/11/77).

employment for the following year.[172] The court, noting that, under Louisiana law, contracts can either be express or implied, found that it was "quite clear . . . that there was a contract" between the professors and the university.[173] The court found that the professors fully expected to teach during the fall semester and specifically noted that because the professors had tenure as teachers, "had the university failed to employ them without legal cause, the university would have been liable."[174] Under Louisiana law, "[t]he existence or nonexistence of a contract is a question of fact."[175] The parties do not dispute that Smith was a tenured professor.[176] Accordingly, the Court finds that there is no genuine issue of material fact as to the existence of a contract. Therefore, Board of Supervisors is not entitled to judgment as a matter of law on Smith's breach of contract claim on the grounds that Smith cannot prove the existence of a contract.

### 2.     Breach of Contract

Board of Supervisors contends that even if the Court finds that there was a contract, it is still entitled to summary judgment on Smith's breach of contract claim.[177] Board of Supervisors contends that the evidence shows that Smith was not terminated, but rather that he voluntarily resigned.[178] According to Board of Supervisors, the only evidence Smith asserts is "his own self-serving, uncorroborated, and conclusory statements in his testimony which are insufficient to defeat a motion

---

[172] *Id.*

[173] *Id.*

[174] *Id.*

[175] *SamStaub Enters., Inc. v. Chapital*, 2011-1050 (La. App. 4 Cir. 3/14/12); 88 So. 3d 690.

[176] Rec. Doc. 68-5 at p. 2.

[177] Rec. Doc. 62-4 at p. 9.

[178] *Id.* at p. 20.

for summary judgment."[179] Board of Supervisors contends that Smith even testified that Lundberg never told him that he should resign or he would be terminated, nor did anyone tell Smith that Williams would not follow the proper procedure to terminate him.[180]

Board of Supervisors also asserts that Smith's testimony regarding his conversation with Williams is contradicted by the emails exchanged between Smith and Williams following the conversation.[181] Board of Supervisors asserts that Smith testified that Williams told him that if he did not receive a letter of resignation the day following their conversation then Smith will be terminated.[182] Board of Supervisors contends that this is contradicted by the fact that the emails demonstrate the conversation between Smith and Williams took place on May 11, 2012, but Smith did not submit his letter of resignation until May 14, 2012.[183] Furthermore, Board of Supervisors contends that the emails demonstrate that Williams had to seek approval before accepting Smith's resignation in lieu of docking his pay, which would be unnecessary if Smith's claims regarding Williams' threats were true.[184]

In opposition, Smith points to his own deposition testimony in which he testified that during his conversation with Williams, Williams threatened him with termination and threatened to withhold his last paycheck.[185] Smith testified that Williams told him, "[i]f I don't receive a

---

[179] *Id.* (citing *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 379 (5th Cir. 2010)).

[180] Rec. Doc. 67-16 at pp. 24–25.

[181] Rec. Doc. 62-4 at p. 22.

[182] *Id.*

[183] *Id.* (citing Rec. Doc. 67-20).

[184] *Id.*

[185] Rec. Doc. 68-2 at p. 7.

[resignation] letter by tomorrow, then you will be terminated and I will reverse that last payment."[186]
Williams completely denies demanding that Smith resign or be terminated or that three weeks pay
would be taken out of his account if he did not resign.[187] Smith also points to an email from Paradise
to Williams, dated May 2, 2012, which states "Talk to [O]lie [Lundberg] and then direct [O]lie to
dock his pay two weeks and terminate him."[188] Smith states in his affidavit that it was only "[u]nder
extreme pressure and duress" that he submitted his letter of resignation.[189] The Court therefore finds
that there is a genuine issue of material fact as to whether Smith was terminated from his position
at the University of New Orleans.

Board of Supervisors also contends that the Court, in denying its motion to dismiss, found
that Smith had put forth sufficient facts to support the reasonable inference that Board of Supervisors
had breached its employment contract with Smith when it allegedly terminated him for teaching
abroad.[190] Board of Supervisors contends that the summary judgment evidence demonstrates
otherwise.[191] Board of Supervisors asserts that the summary judgment evidence "shows that teaching
in Brazil during the spring 2012 semester without permission is not the only time Smith has ignored
University rules."[192] Board of Supervisors points to the deposition testimony of Smith in which he
admits that the official end of the spring 2012 term was May 15, 2012.[193] In addition, Board of

---

[186] Rec. Doc. 67-16 at p. 32.

[187] Rec. Doc. 67-17 at p. 9.

[188] Rec. Doc. 68-13.

[189] Rec. Doc. 68-7 at p. 7.

[190] Rec. Doc. 62-4 at p. 9.

[191] *Id.*

[192] *Id.* at p. 13.

[193] *Id.* at p. 14 (citing Rec. Doc. 67-16 at p. 14).

Supervisors asserts that Williams testified that there "would have to be some completely extenuating circumstance" in order for a professor to be permitted to be absent from the University of New Orleans for the last two weeks of the semester and that approval would have to come from the Provost.[194] Furthermore, Board of Supervisors asserts there is evidence in the record from Williams' and Paradise's depositions that Smith did not complete his classes and that under Louisiana law, Smith was not allowed to work for two entities.[195]

In opposition, Smith asserts that there was a breach of contract because the University of New Orleans did not have just cause to terminate his employment and therefore violated his tenure rights.[196] First, Smith contests Board of Supervisors' assertion that extenuating circumstances would be necessary for a professor not to be on campus for the last two weeks of class.[197] Smith points to the testimony of Lundberg regarding other professors, Myles Hassell and Shannon Layton, and their absences from campus during the last two weeks of the semester, as well as Lundberg's testimony that he did not require faculty members in the Department of Management to be physically present in the last weeks of the semester.[198] In addition, Smith presents the testimony of Lundberg in support of his assertion that Smith did complete teaching his classes by grading the final projects.[199] Therefore, the Court finds that there is a genuine issue of material fact regarding whether Smith's absence from campus during the last weeks of the semester and the alleged failure to complete his

---

[194] *Id.* at pp. 15–16 (citing Rec. Doc. 67-17 at pp. 5–6).

[195] *Id.* at p. 16 (citing Rec. Doc. 67-17 at p. 17; Rec. Doc. 67-19 at pp. 22–23).

[196] Rec. Doc. 68 at p. 11.

[197] *Id.*

[198] *Id.* at p. 13 (citing Rec. Doc. 68-4 at pp. 11–12).

[199] *Id.* at p. 14 (citing Rec. Doc. 68-4 at p. 11).

classes constitute cause to terminate him. Accordingly, the Court denies Board of Supervisors'
motion for summary judgment on Smith's breach of contract claim.[200]

## C.     *Louisiana Due Process Claim*

In the Court's Order on Defendants' "Rule 12(b)(6) Motion to Dismiss,"[201] the Court noted
that Smith's Second Amended Complaint did not make clear whether he intended to assert a specific
claim under the Louisiana due process clause.[202] The Court, finding that the parties had not
adequately briefed the elements of a Louisiana due process claim or the legal standard, denied
Defendants' motion to dismiss regarding a Louisiana due process clause claim.[203] In Smith's Third
Amended Complaint, Smith incorporated by reference all of the allegations in his Second Amended
Complaint and added an allegation that "Defendants have violated the Louisiana due process
clause."[204]

Board of Supervisors now moves for summary judgment on Smith's Louisiana due process
claim, asserting that the summary judgment evidence confirms that the Louisiana procedural due
process requirements have been met.[205] Board of Supervisors contends that the Court, in ruling on
its motion to dismiss, held that Smith's pre-termination communication, as outlined in the complaint,
was sufficient as a matter of law to meet procedural due process requirements as long as a full post-

---

[200] Smith objected to the Court's consideration of Record Document 67-18, an unsigned and undated
document titled "My statements in response to the charges made," allegedly written by Williams. Rec. Doc. 68 at p.
15. The Court finds that it need not address this issue as there is other evidence in the record which demonstrates a
genuine issue of material fact regarding Smith's breach of contract claim.

[201] Rec. Doc. 11.

[202] Rec. Doc. 43 at p. 74.

[203] *Id.*

[204] Rec. Doc. 55.

[205] Rec. Doc. 62-4 at p. 28.

termination hearing was also available to Smith at a meaningful time.[206] Board of Supervisors also contends that the Court rejected Smith's assertion that he was unable to file a grievance because he was out of the country.[207] Board of Supervisors asserts that the Court held that Smith could not claim that Defendants were responsible for depriving him of a post-deprivation hearing because Smith failed to timely avail himself of the hearing.[208]

In opposition, Smith contends that he was constructively discharged without proper notice and without a pre-termination hearing.[209] Smith asserts that the five-minute conversation that was dominated by Williams was not sufficient to meet procedural due process requirements.[210] Furthermore, he asserts that he was denied the faculty post-termination grievance procedure allegedly because he was too late.[211] However, Smith points to the Faculty Grievance Procedure which states that a grievance must be filed "within 30 calendar days during an academic term after official notification to the faculty member of the action which the faculty member is challenging."[212] Smith contends that he called about his right to file a grievance soon after June 20, 2012, which was not during an academic term, and therefore there was no thirty-day time limit to file a grievance at that time.[213] Furthermore, Smith asserts that he did not receive any official notification of the action

---

[206] *Id.* (citing Rec. Doc. 43 at p. 42).

[207] *Id.*

[208] *Id.*

[209] Rec. Doc. 68 at p. 23.

[210] *Id.* at p. 24.

[211] *Id.*

[212] *Id.* at pp. 24–25 (quoting Rec. Doc. 62-28 at p. 2).

[213] *Id.* at p. 25.

that Board of Supervisors was taking and therefore cannot have been late with a grievance.[214]

The Louisiana Second Circuit Court of Appeal has explained that the Louisiana and federal due process clauses are "nearly identical in language," and it has expressly found "the two clauses to be coextensive and to provide the same due process protection."[215] The Louisiana Fourth Circuit Court of Appeal has also found that the Louisiana Constitution's due process clause "does not vary semantically from the Due Process Clause of the Fourteenth Amendment" and "federal jurisprudence is [therefore] relevant in determining the nature and extent" of the Louisiana Constitution's due process protection.[216]

Therefore, in order to prove a claim for denial of Louisiana procedural due process, Smith must show that: (1) he had a property right in continued employment, and (2) he was deprived of this right without due process.[217] Here, the parties only dispute the second prong. In *Cleveland Board of Education v. Loudermill*, the United States Supreme Court held that "an essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case," and concluded that the "root requirement" of the Due Process Clause is that an individual must be given a hearing "before he is deprived of any significant property interest."[218] In *Loudermill*, the Supreme Court addressed a claim arising from the

---

[214] *Id.*

[215] *Louisiana v. Smith*, 614 So. 2d 778, 780 (La. App. 2 Cir. 1993).

[216] *Plaquemines Par. Gov't v. River/Road Const., Inc.,* 2001-2222, p. 11 (La App. 4 Cir. 8/28/02); 828 So. 2d 16.

[217] *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 538 (1985).

[218] *Id.* at 542 (citations omitted).

termination of a civil service employee,[219] and concluded that the plaintiff was entitled to "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story."[220]

As the Court noted in its Order on Defendants' motion to dismiss, in both *Browning v. City of Odessa*[221] and *Brown v. Texas A&M University*,[222] the Fifth Circuit found that one-on-one discussions between a public employee and a supervisor are constitutionally adequate procedures at the pre-termination stage when the discussions are followed by a more substantial hearing after termination.[223] Smith contends that the "short conversation [which] lasted about five minutes and was dominated by Williams" does not satisfy procedure due process requirements.[224] The summary judgment evidence presented by Smith aligns with what Smith alleged in his Second Amendment Complaint. The Court found in its Order on Defendants' motion to dismiss that the pre-termination communication is sufficient, as a matter of law, as long as a "full post-termination hearing" was also available to Smith at a meaningful time.[225] The summary judgment evidence presented does not change the Court's analysis as to this issue. Therefore, the Court turns to the availability of a post-termination hearing.

It is undisputed that Smith did not participate in any post-termination hearing. As the Court

---

[219] *Id.* at 532 ("Under Ohio law, Loudermill was a 'classified civil servant,' and by statute, as such an employee, could be terminated only for cause and was entitled to administrative review of the dismissal.").

[220] *Id.* at 546.

[221] 990 F.2d 842 (5th Cir. 1993).

[222] 804 F.2d 327 (5th Cir. 1986).

[223] Rec. Doc. 43 at p. 42.

[224] Rec. Doc. 68 at p. 24.

[225] Rec. Doc. 43 at p. 42.

noted in its Order on Defendants' motion to dismiss, the Fifth Circuit, in *Rathjen v. Litchfield*[226] and *Myrick v. City of Dallas*,[227] held that a plaintiff cannot claim deprivation of due process after failing to take advantage of adequate post-termination procedures.[228] Board of Supervisors contends that the summary judgment evidence confirms that Smith failed to take advantage of the grievance procedure available to him and therefore cannot now complain that he was denied due process.[229] In support, Board of Supervisors points to the Faculty Grievance Procedure itself, asserting that the procedure is initiated by submitting a letter to the person against whom the grievance is being made, including a statement regarding the exact nature of the grievance and the proposed resolution, and all available supporting documentation, and that a copy of the letter should be sent to the administrator who is the immediate supervisor of the person being grieved against.[230] Board of Supervisors asserts that Smith admitted during his deposition that he did not attempt to initiate a grievance while he was in Brazil.[231] Board of Supervisors further asserts that Smith testified that once he was told that it was too late to file a grievance, he did not attempt to pursue a grievance but decided to contact an attorney.[232]

Smith now asserts that his request for a procedure was not untimely because pursuant to the Faculty Grievance Procedure, a grievance must be filed "[w]ithin 30 calendar days during an academic term after official notification to the faculty member of the action which the faculty

---

[226] 878 F.2d 836, 839–40 (5th Cir. 1989).

[227] 810 F.2d 1382 (5th Cir. 1987).

[228] Rec. Doc. 43 at p. 44.

[229] Rec. Doc. 62-4 at p. 30.

[230] *Id.* (citing Rec. Doc. 67-4 at p. 39).

[231] *Id.* at p. 31 (citing Rec. Doc. 67-16 at p. 40).

[232] *Id.* at pp. 31–32 (citing Rec. Doc. 67-16 at pp. 42–43).

member is challenging," where academic term is defined as beginning on the date academic appointments become effective and ending on the day after Commencement.[233] Smith asserts that there was no thirty-day time limit because he called about his right to file a grievance "soon after June 20, 2012," which is after Commencement and not during an academic term.[234] Smith also argues that he has never been given an official notification of any action by the University of New Orleans and that the Grievance Review Committee has the authority to extend the time limits specified in the policy.[235]

Smith testified that the official end of the term was May 15, 2012.[236] Smith also testified that he spoke with Williams on May 14, 2012 and that he submitted a letter of resignation.[237] The emails submitted by Board of Supervisors indicate that the letter of resignation was submitted on May 14, 2012.[238] When Smith contacted Human Resources, "soon after June 20, 2012," it had been more than thirty calendar days after Smith submitted his letter of resignation. However, it is unclear how the words "during an academic term" in the Faculty Grievance Procedure modify, if at all, this thirty-day time limit, and if the grievance procedure is even available during the summer, in between academic terms. Therefore, the Court finds that there is a genuine issue of material fact as to the availability of a grievance procedure during the summer and whether Smith's request to participate in any such procedure was timely.

The Court has found that the pre-termination communication that took place in this case is

---

[233] Rec. Doc. 68 at p. 24 (citing Rec. Doc. 67-4 at p. 39).

[234] *Id.* at p. 25.

[235] *Id.*

[236] Rec. Doc. 67-16 at p. 14.

[237] *Id.* at p. 29.

[238] Rec. Doc. 67-22.

sufficient, as a matter of law, but only as long as a "full post-termination hearing" was also available to Smith at a meaningful time.[239] Making all reasonable inferences in favor of Smith, a jury could find, based upon the ambiguity in the terms of the grievance procedure, that Smith was improperly deprived of the hearing when he was told that his request for a grievance procedure was untimely. Accordingly, the Court denies Board of Supervisors' motion for summary judgment on Smith's Louisiana due process claim.

## IV. Conclusion

Considering the foregoing, the Court finds that there exists a genuine issue of material fact as to both Smith's claims for breach of contract and Louisiana due process.

Accordingly,

**IT IS HEREBY ORDERED** that Board of Supervisors' "Motion for Summary Judgment"[240] is **DENIED**.

**NEW ORLEANS, LOUISIANA**, this 11th day of December, 2015.

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

[239] *Brown v. Texas A&M Univ.*, 804 F.2d 327 (5th Cir. 1986).

[240] Rec. Doc. 67.

38